# Illinois Official Reports

## Appellate Court

> ### *People v. Khan*, 2021 IL App (1st) 190679

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MUHAMMAD KHAN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-19-0679 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CR-00256; the Hon. Alfredo Maldonado, Judge, presiding. |
| Judgment | Judgment affirmed in part and vacated in part; mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Beverly M. Jones, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1         After a jury trial, on February 13, 2019, defendant Muhammad Khan[1] was convicted of aggravated driving under the influence (DUI) of alcohol with a suspended or revoked driver's license (625 ILCS 5/11-501(a)(2), (d)(1)(G) (West 2016)) and sentenced to five years in the Illinois Department of Corrections (IDOC), followed by one year of mandatory supervised release. Defendant appeals, claiming (1) the trial court should have conducted a fitness hearing due to defendant's conduct, (2) defendant did not knowingly and intelligently waive his right to counsel, (3) defendant should have been permitted standby counsel, (4) the trial court erred in instructing the jury, and (5) defendant was entitled to a new trial because he waived his right to a jury trial. For the reasons that follow, we affirm the trial court's judgment in part but vacate defendant's conviction on count II and order the mittimus corrected.

¶ 2                                BACKGROUND

¶ 3         During the early morning hours of December 18, 2017, defendant was arrested after an incident outside a police station, in which defendant was observed by several officers to be standing outside a vehicle that was parked facing northbound in the southbound lanes of traffic while arguing with another individual. Upon the officers approaching the arguing individuals, defendant admitted to driving the vehicle and gave the officers the keys, and the officers observed signs of alcohol intoxication, including the odor of alcohol on defendant's breath, slurred speech, and bloodshot and glassy eyes; defendant also failed several field sobriety tests. At the time of defendant's arrest, an arrest warrant was also executed with respect to defendant's alleged violation of probation for case No. 09-CR-19247, which was another aggravated DUI of alcohol offense for which defendant had been convicted in 2011.[2]

¶ 4         On December 28, 2017, defendant was charged in case No. 18-CR-00256 with four counts of aggravated DUI of alcohol, in that defendant drove or was in actual physical control of a vehicle while under the influence of alcohol and (1) had previously violated the DUI statute on two prior occasions (625 ILCS 5/11-501(d)(1)(A) (West 2016)), (2) the offense was committed while his driving privileges were revoked for a violation of the DUI statute (625 ILCS 5/11-501(d)(1)(G) (West 2016)), (3) the offense was committed while his driving privileges were suspended due to a violation of section 11-501.1 of the Illinois Vehicle Code (625 ILCS 5/11-501(d)(1)(G), 11-501.1 (West 2016)), and (4) the offense was committed while he did not possess a valid driver's license (625 ILCS 5/11-501(d)(1)(H) (West 2016)).

¶ 5         Defendant appeared before the trial court for arraignment on January 18, 2018, where defendant was informed that he had two matters pending—the violation of probation and the new DUI charge; defendant was present in court that day only for his arraignment on the new DUI charge. The trial court asked defendant if he had an attorney, and defendant stated that he wished to represent himself. The court informed defendant that he had the right to an attorney and, if he could not afford one, one would be provided for him. However, defendant stated that he wished to represent himself "because I know the whole story of this new matter." The court then informed defendant as to the nature of the charges against him and the sentencing range.

---

[1]The record shows that defendant is known both as Muhammad Adeel Khan and as Adeel Khan.

[2]Defendant's challenge to that matter is considered in *People v. Khan*, 2021 IL App (1st) 190051, which is being filed concurrently with the instant opinion.

In response, defendant stated: "Judge, actually this case is not supposed to exist because I was not driving." The court cautioned defendant that a court reporter was present, so he should not say anything that could harm his case.

¶ 6 The court then questioned defendant about his education and whether he had any legal training or knowledge. After determining that defendant had no legal knowledge, the court cautioned defendant that "[b]y you representing yourself in this matter, you put yourself at a huge disadvantage," which was why defendant had the right to an attorney. Defendant responded that he understood and asked, "[w]ill you just give me a chance to speak for a few seconds please?" The court told defendant "that's not how this works. You don't just talk to me. The State's trying to put you in prison. You have a right to a trial." The court then asked defendant whether he was pleading guilty or not guilty, and defendant responded that he was not guilty. The court asked if defendant was waiving the formal reading of the charges, and defendant responded:

> "Judge, I'm not—Everything—Every question I am going to say no because I'm not— this case is not supposed to be existing from nowhere, Judge, because I was not driving. I was not in the car."

¶ 7 At that point, the court stated that it "[had] some concerns" about defendant so, before proceeding any further, it would order a behavioral clinical examination (BCX). The court further stated that it would not proceed on the arraignment at that time, as defendant had requested to represent himself *pro se* and the court wished to review the results of the BCX before making a decision on whether defendant could represent himself. The court informed defendant that he would meet with doctors for an evaluation. Defendant responded, "Okay. No problem, but, Judge, you give me a few seconds so I can speak with you, Judge, about my case." The court again informed defendant "[t]hat's not how this works," but defendant continued attempting to speak with the court about the case no matter what the court said.

¶ 8 On February 16, 2018, the trial court stated that, after completing a BCX, Dr. Nishad Nadkarni, a forensic psychiatrist, opined that defendant was fit to stand trial.[3] The court then asked defendant if he still wished to represent himself on the new DUI charge, and defendant responded that he did. The court again advised defendant that he had the right to counsel, and defendant stated that he understood. The court reminded defendant that if he could not afford an attorney, one would be provided for him. Defendant stated that he understood, and the court again asked defendant about his knowledge of legal procedure, reminding him that "if you represent yourself, I can't give you legal advice. I can't treat you any differently than I would treat anyone else." Defendant then engaged in the following colloquy with the court:

> "DEFENDANT: Okay, Your Honor. The best thing I can do, I can [represent] myself; and I can take a help from the—
> THE COURT: No, no, that's not a help, okay?
> DEFENDANT: It's called—
> THE COURT: Listen to me.

---

[3]A letter from Dr. Nishad Nadkarni, a forensic psychiatrist with Forensic Clinical Services, is contained in the record for appeal No. 1-19-0679. While the letter provides that Dr. Nadkarni opined, to a reasonable degree of medical and psychiatric certainty, that defendant was fit to stand trial, the psychiatric summary outlining the basis for that opinion does not appear in the record for either appeal.

If you want the Public Defender's Office, I will appoint the Public Defender's Office.

If you want to represent yourself, you'll represent yourself.

If you're asking for Standby Counsel, you don't have a right to have Standby Counsel.

I have to determine whether Standby Counsel is necessary, and that's on a case-by-case basis."

The court also again informed defendant of the nature and sentencing range for the new DUI charge, and defendant responded that "I understand definitely." After further discussion with defendant, the trial court stated: "All right. You may represent yourself on the new case and the [violation of probation]." The court then proceeded with the arraignment on the new DUI charge, and defendant entered a plea of not guilty.

¶ 9     The court then stated that, "if you're requesting to have Standby Counsel, I'm going to deal with that request now, because I think he was making that request." The court asked the State if the case involved any scientific testing, and the State responded that there were no allegations relating to defendant's blood alcohol level, and no allegations that a blood draw or Breathalyzer were involved. The court then stated:

"It doesn't sound, then, that the factual allegations are complex enough, that it will require me to appoint Standby Counsel.

So, you're not going to have a Public Defender or any other lawyer to act as Standby Counsel. You're going to be representing yourself in this matter.

I mean, I exercise discretion here; and I find that *** the complexities of this case, while *** the sentences, the possibility of incarceration is serious; but the complexity of the case does not necessitate Standby Counsel.

So, your request for Standby Counsel is respectfully denied."

¶ 10     On the same day, defendant filed a *pro se* motion to dismiss based on double jeopardy, in which defendant claimed that the DUI matter was previously tried on December 22, 2017, and the trial court found no probable cause. Defendant also wrote a letter to the trial court:

"First and foremost I would like to apologize for my misbehaving in your court room on 01-16-18. This was my first time in a court room without [a] private attorney. I felt that the [state's attorneys] were being very hard on me and it made me very stressful. For a false matter being discussed about me. That on 12-18-17 [the] officer created a case against me and on 12-22-17 [the preceding] judge on my case dropped all charges.

I am very wrong for my words I used on that day in your court room, the words I said were out of stress and anger, the words I said were that I wanted a jury trial and I would like to take my words back. I promise that in the future I will always think about my words before I speak them. I would like to ask the Honorable Judge to be my jury in this matter. I pray and hope my request is granted."

¶ 11     The parties next came before the court on February 23, 2018, and the trial court informed defendant that he was not permitted to write letters to the court, but that the court had read defendant's apology. As to defendant's motion to dismiss, the court asked the State whether, in fact, there had been a finding of no probable cause, as defendant contended. The State provided the court with a transcript of the preliminary hearing proceedings on December 22,

2017, in which court made a finding of probable cause as to one DUI count, but made a finding of no probable cause as to another count. Defendant interrupted, claiming that the transcript was "not the right transcript." The court explained that the transcript was the official court record of the proceedings, but defendant claimed that it was a "false transcript." The court found no basis for defendant's motion and denied the motion to dismiss.

¶ 12     On March 9, 2018, defendant again filed a motion to dismiss based on double jeopardy, again claiming that all charges against him had been dismissed on December 22, 2017. Defendant filed a third motion to dismiss based on double jeopardy on April 6, 2018, adding claims of "perjury" based on the State's providing "false transcripts" of the preliminary hearing. The parties came before the court on April 6, 2018, where defendant again claimed that the transcript of the preliminary hearing was a "false transcript." Defendant claimed that the trial court found no probable cause at the preliminary hearing but that he was later taken to the courthouse in Skokie, where the state's attorney told the court that defendant was being "re[-]indict[ed]" on a "2009 pending matter." The judge hearing the matter told the state's attorney to "send him back to Cook County to the same judge who [had the] 2009 matter pending." Defendant claimed that "[s]o that means *** [the] honorable judge [at the] Skokie court [didn't] want to re[-]indict me for the matter being closed on preliminary hearing December 22." The court then addressed defendant:

"THE COURT: [Defendant], you clearly don't understand what's going on.

DEFENDANT: I understand exactly, your Honor, what's going [on].

* * *

THE COURT: [Defendant], you don't. It is absolutely obvious that you have no understanding.

I told you, [defendant], that you have a right to represent yourself. Right? I told you that. I went over this with you. Right? But you do not understand the law.

DEFENDANT: Your Honor—

THE COURT: You think you do.

DEFENDANT: I understand the law.

THE COURT: But you don't."

¶ 13     The court then asked the assistant state's attorney to address defendant's claim that there was a later proceeding in which charges against defendant were dismissed. The assistant state's attorney confirmed that there was not, and defendant interjected:

"DEFENDANT: Okay. January 18, your Honor, the State told you he got the 2006 DUI, 2008 DUI. Remember? You told me 2006—6 DUI for supervision. Then she said 2008 DUI. You told me 30 month probation.

THE COURT: That was a bond hearing. There was a bond hearing.

DEFENDANT: That was a re-indictment, your Honor.

THE COURT: No, no, that's not a re-indictment.

DEFENDANT: Yes, sir.

THE COURT: [Defendant], you are on probation for a 2009 DUI. You have a new case. You have two things before me. Right? You have a probation matter and then you have this new case. There is no re-indictment. That's—

- 5 -

DEFENDANT: Your Honor, when she said—I mean, 2008 DUI, then she said 2011 DUI, then she said 2017 DUI.

THE COURT: She was reading off your criminal history—

DEFENDANT: The reason she was reading, your Honor, because I wasn't at Skokie. And State Attorney said only 2009 DUI pending. Judge denied to reopen.

THE COURT: [Defendant], it is not reopen[ed]. You are on probation. There is a pending violation of probation for the 2009 case. You have two matters."

The court then denied defendant's motions to dismiss. Defendant stated that he would not file any more motions but that he would "come up with something." The court reminded defendant that "what would make things really simple, [is] if you actually allowed yourself to be represented by an attorney." Defendant responded that "I know what I am doing exactly."

¶ 14        The court then asked the State about outstanding discovery and asked whether the State was electing to proceed first on the probation matter or on the new DUI charge. The assistant state's attorney responded that the State would be proceeding first on the probation matter. Defendant then interjected, stating that he "would like to transfer this matter to the federal court." The court asked defendant to listen and then admonished him that the State was electing to proceed on the probation matter first. The court informed defendant that the State was required to prove the violation of probation by a preponderance of the evidence, not beyond a reasonable doubt. Defendant told the court that he was going to "reopen the probation matter," and the court responded that the State would be proceeding first on the probation matter. The court further informed defendant that the State was required to prove the violation of probation by a preponderance of the evidence, that the State would call witnesses that defendant had the right to cross-examine, and that he had the right to counsel. Defendant again responded that he "would like a trial in federal court." The court informed defendant that there was no basis for removal to federal court, and defendant stated that he was going to "contact them" and "beg them."

¶ 15        The court then again asked the State about outstanding discovery, and the assistant state's attorney responded that the only outstanding issue was obtaining video of defendant's arrest on the new DUI charge. The court spoke with the State about obtaining the video, and defendant interrupted, stating that he was turning himself in when he was arrested for the new DUI charge. Defendant further stated that, "[t]he same day before I turned myself in, I was trying to contact the federal government, you know. I'm trying to contact the FBI because I'm going to expose some FBI crime." The court then stated that it was going to order another BCX of defendant. Defendant asked why he needed to be evaluated, and the court told him that "I just want to make sure that there [are] no problems or anything."

¶ 16        On May 11, 2018, the parties appeared before the trial court, and the court stated that Dr. Fidel Echevarria, a psychiatrist, had attempted to conduct a BCX of defendant but was unable to render an opinion because defendant was not cooperative, became agitated, and refused to complete the assessment. Defendant also refused to authorize the release of his current medication profile and any treatment.[4] The court informed defendant that he was required to

---

[4]A letter from Dr. Fidel Echevarria, a psychiatrist with Forensic Clinical Services, is contained in the record on appeal. While the letter provides that Dr. Echevarria could not opine as to defendant's fitness to stand trial due to defendant's lack of cooperation, the psychiatric summary outlining "the basis of [his] opinion or lack thereof" does not appear in the record on appeal.

cooperate with the doctor, and defendant agreed to complete the evaluation. On the same day, defendant filed another motion to dismiss the new DUI charge based on double jeopardy, and subsequently filed additional motions to dismiss the new DUI charge based on double jeopardy on June 15, 2018, and June 26, 2018.

¶ 17        On June 26, 2018, the parties appeared before the trial court on defendant's motions to dismiss.[5] The court noted that defendant had been evaluated and found fit to stand trial.[6] Defendant then again stated that the case had been "dismissed in preliminary hearing," and the court responded that "we already addressed all this." Defendant claimed that he had "another question" about the case number. Defendant claimed that the case number of the new DUI charge had been changed and that he was being "re[-]indicted" on a case that had already been dismissed. The assistant state's attorney explained that there was a finding of no probable cause on one count on December 22, 2017, but that there was a finding of probable cause on the second count. Defendant would have received a court date two weeks from that date for the arraignment on that count, which would have been in January 2018. Therefore, when defendant's felony trial number was assigned, it was an "18 CR" number even though the offense and preliminary hearing occurred in 2017. Defendant continued arguing, and the trial court informed defendant that the assistant state's attorney was attempting to explain the situation, but "you just aren't understanding it." Defendant then stated that he had a right to "[c]all media on this situation." The trial court verified that discovery was complete and denied defendant's motion to dismiss.

¶ 18        On July 20, 2018, defendant filed a motion for substitution of judge for cause, claiming that the trial judge was prejudiced against him, as well as two more motions to dismiss based on double jeopardy and perjury. The matter was transferred to a different judge for hearing on the motion for substitution of judge, which occurred on July 23, 2018. Defendant again claimed before the new judge that the DUI charge had been dismissed during the preliminary hearing. The court asked the State to respond, and the assistant state's attorney stated:

> "I think he really lacks the ability here to understand the legal procedures here in this case.
>
> There was a finding of probable cause. He is charged by information. He fails to grasp, I believe because he is not a lawyer, *** has never practiced law, the criminal procedure, process of when somebody is charged by indictment and whether somebody is charged by information and how those come after an initial complaint, and an initial municipal case is generated.
>
> So, Judge, what I have done, as my partner has done, as I believe on the record several times, is try to explain that his case number changed because now it is in the

---

[5]The transcript of the June 26, 2018, hearing is contained in the record in *Khan*, 2021 IL App (1st) 190051.

[6]A letter from Dr. Brian Curran, a licensed clinical psychologist with Forensic Clinical Services, is contained in the record on appeal. While the letter provides that Dr. Curran opined, to a reasonable degree of psychological and scientific certainty, that defendant was fit to stand trial, Dr. Curran was unable to render an opinion as to defendant's sanity at the time of the alleged offense or his ability to understand the *Miranda* warnings, as defendant refused to sign the release of information forms for his treatment records. Additionally, as with the other letters, the psychiatric summary outlining the basis for Dr. Curran's opinion does not appear in the record for either appeal.

felony trial division. It gets the CR number and it no longer has the municipal number and that municipal file, if there is any uncharged items, it would then follow, whether traffic or whatever they may be.

So we tried to explain that and he just—in my view, *** he just doesn't appear to grasp that and that's just—I just don't believe that's grounds for, I don't know, for an SOJ for cause.

Judge Maldonado has attempted to explain that and help him out as much as possible but he is representing himself and I just don't think he is really grasping the legal concept."

¶ 19    Defendant continued to insist that the earlier case had been dismissed, and eventually, the court explained to defendant that, even if everything defendant claimed was true, in order to obtain a substitution of judge for cause, he was required to show that he was prejudiced by the judge's conduct. Defendant then proceeded to relate a chronology of the proceedings in his case, expressing his frustration. At one point, defendant claimed that the assistant state's attorney had laughed at him when he was leaving the courtroom after a prior hearing. The court denied the motion for substitution of judge, finding:

"As far as what you have explained to me and what I've read in your affidavit and in your motion, I don't see any basis for me to SOJ, to substitute Judge Maldonado for cause. It seems to me that *** you take umbrage and you don't believe that *** he has ruled properly in the case but I'm a little bit at a loss too because *** you're showing me the transcript and you're saying the transcript is incorrect.

You [have] got to be able to *** prove that it's more than just you saying that it's incorrect."

¶ 20    After the denial of the motion for substitution of judge, the case was transferred back to Judge Maldonado, and defendant filed another motion to dismiss based on double jeopardy, which was heard and denied the same day. The State also made defendant an offer on the new DUI case, which defendant declined. On July 26, 2018, defendant again filed another motion to dismiss, which was heard and denied the same day. Similarly, on August 9, 2018, defendant filed another motion to dismiss, which was heard and denied the same day.

¶ 21    On August 15, 2018, the parties appeared before the trial court for a hearing on the violation of probation. The State presented the testimony of one witness, defendant's probation officer, who testified that defendant had not reported to probation since December 6, 2012. Defendant also spoke on his own behalf, although the record does not show that he was sworn in prior to his comments. The court found that defendant had violated his probation by failing to report to his probation officer and set the matter for a sentencing hearing on September 14, 2018, at which time the trial court sentenced defendant to 2½ years in the IDOC, followed by 1 year of mandatory supervised release.

¶ 22    After defendant was sentenced on the probation matter, the court stated that it would be setting the new DUI charge for trial. Defendant responded that he was not agreeing to a trial and that he was "demanding a motion hearing." The court informed defendant that there was no motion pending, stating: "We've already addressed this. What date do you want to come back for trial, and it will be a jury indicated unless [defendant] waives." The court and the State then began discussing scheduling. The court then addressed defendant, informing him that the State had nol-prossed count I, so it was proceeding only on counts II, III, and IV. The court

informed defendant that he was charged with three Class 4 DUI of alcohol charges, which were subject to extended-term sentencing, meaning that he could be sentenced from one to six years in the IDOC, followed by one year of mandatory supervised release, and reminded him that he had the right to counsel.

¶ 23 On November 13, 2018, the parties appeared before the trial court, and the State informed the court that the matter was set for a jury trial. Defendant responded, "Nothing by-agreement, your Honor." The State informed the court that it was not ready for trial, and defendant interjected, stating: "Who is demanding jury trial? I'm not agreeing for anything." The court responded:

> "THE COURT: All right. [Defendant], the only person who picks a jury trial is you. If you don't want a jury trial then you don't have a jury trial.
>
> DEFENDANT: Your Honor, I [do] not agree for any trial."

¶ 24 The trial court explained to defendant that cases were resolved either by agreement or by going to trial, but defendant repeatedly stated, "Nothing by-agreement" while also stating that he was not agreeing to trial. The court then discussed with defendant:

> "THE COURT: *** I take it then if you are not agreeing to any dates, that it you're asking to go Motion State—
>
> DEFENDANT: Continue, not by-agreement, trial not by-agreement, prosecution not by-agreement. And I already filed (inaudible). I'm doing my rights. I love [the] United States Constitution.
>
> So as much as I—
>
> THE COURT: I understand that. If it's not by-agreement, it is motion state, defendant demands trial.
>
> Bench or jury, [defendant]?
>
> DEFENDANT: Nothing. Nothing by-agreement.
>
> THE COURT: All right. [Defendant]—
>
> DEFENDANT: *** I am not giving you [any] chance for personal jurisdiction.
>
> THE COURT: That's fine, [defendant].
>
> Then since [defendant] has not indicated—
>
> DEFENDANT: Nothing by-agreement.
>
> THE COURT: It will be a jury, since that is—
>
> DEFENDANT: Nothing by-agreement.
>
> THE COURT: All right.
>
> Motion State—
>
> DEFENDANT: I'm not going to pass no jury.
>
> THE COURT: [Defendant], *** I want you to listen carefully. I have already admonished you for—
>
> DEFENDANT: You [are] just running this court with your own jurisdiction.
>
> THE COURT: —trial in absentia.
>
> DEFENDANT: No.
>
> THE COURT: [Defendant]—
>
> DEFENDANT: Nothing by-agreement.

THE COURT: [Defendant], if you willfully fail to appear for trial, your absence could be taken as a waiver of your right to be here for trial.

DEFENDANT: Nothing by-agreement. You can do what you do your Honor. I have no problem. There is nothing by-agreement."

¶ 25    The court continued discussing scheduling, with defendant repeating that he was not agreeing to anything because the court lacked jurisdiction due to defendant's double-jeopardy claims. The court set trial for December 11, and defendant interrupted:

"DEFENDANT: December 11th for what?

THE COURT: December 11th, with, for jury. Jury indicated.

DEFENDANT: Jury denied.

THE COURT: And—

DEFENDANT: I am not [going] to pass jury, so how [are] you going to do a jury trial?

THE COURT: [Defendant], if you choose not to participate in these proceedings, these proceedings will continue—

DEFENDANT: It's not about the proceeding; it's about the fraud. It's about your misconduct.

THE COURT: —tried in your absence.

DEFENDANT: I'm not agreeing for any trial.

THE COURT: Okay."

¶ 26    On December 11, 2018, the parties appeared before the trial court, and the State informed the court that the matter was set for a jury trial that day, but the State was not ready for trial. Defendant responded: "Nothing by agreement. Even jury trial not by agreement." The court then stated:

"THE COURT: Okay. Just so our record is clear about the issue of demand and speedy trial. [Defendant] has not been agreeing to any dates, but he is also taking the position he doesn't want a trial either; is that correct?

ASSISTANT STATE'S ATTORNEY: Correct.

THE COURT: Is that correct, [defendant]?

DEFENDANT: Yes, your Honor."

Defendant continued to take the position that there were no valid charges against him and that he was not agreeing to the trial. The State indicated that it was going to be filing a motion *in limine*, and defendant again responded, "Nothing by agreement." The State also informed the court that it had again made an offer to defendant, which defendant declined. Defendant confirmed that he had rejected the offer saying, "Yeah, I do. I have a right to reject."

¶ 27    Trial began on January 14, 2019, and continued to January 15, 2019. The State proceeded on two counts: count II, for DUI of alcohol while defendant's driving privileges were revoked for a violation of the DUI statute (625 ILCS 5/11-501(d)(1)(G) (West 2016)); and count IV, for DUI of alcohol while defendant did not possess a driver's license (625 ILCS 5/11-501(d)(1)(H) (West 2016)). The court once again admonished defendant, informing him of the minimum and maximum sentences for the charged offenses. Defendant stated that he objected, and the court addressed defendant:

- 10 -

"THE COURT: *** So, [defendant], since you have taken the position that you don't want to participate. I want to make sure that you understand, you do have a right obviously to participate.

DEFENDANT: I am participating. I am going by the law.

THE COURT: Okay. So listen to me, [defendant]. State is ready for trial and are you ready for trial?

DEFENDANT: Your Honor, I do not understand the charges first of all. You [have] to explain to me what I am charged with first.

THE COURT: [Defendant].

DEFENDANT: So *** let's go through with it now. Come on.

THE COURT: [Defendant], we've gone over this many times.

DEFENDANT: You never explained to me what I'm charged with, your Honor.

THE COURT: We will go over it again, [defendant].

DEFENDANT: Thank you."

The court then read the charges to defendant. Defendant responded: "I hear you, your Honor, but I still do not understand it." The court reminded defendant that he had the right to counsel, and defendant insisted that he would represent himself. Defendant then again indicated that he did not understand, and the court asked:

"THE COURT: So what is it that you have [as] your question, [defendant].

DEFENDANT: Your Honor, what I am charged with, I do not understand the charge.

THE COURT: I just told you aggravated driving under the influence of alcohol."

Defendant responded by stating that he had motions to dismiss based on double jeopardy and based on a lack of jurisdiction. The court denied his motions, finding that they were duplicative of previously dismissed motions and lacked merit.

¶ 28    The court then began explaining to defendant the procedures of the trial, beginning with jury selection. The trial court informed defendant that he would be able to wear civilian clothes if he wished, and defendant refused, repeating that he was not agreeing to anything. The court then explained that the prospective jurors would be brought into the courtroom and that both parties would have the opportunity to ask questions and to select the jurors. Defendant responded that "I am not picking no jury, you know that," and repeated that he would not be participating throughout the court's explanation. The court then explained that both sides would have the opportunity to present opening statements and then the State would call witnesses, which defendant would have the right to cross-examine. Defendant responded, "I don't agree for this trial. You don't have to explain [to] me all this," and again stated that he would not be participating. The court informed defendant that, after the State rested, he could move for a directed verdict and, if that was denied, had the opportunity to call witnesses in his own defense but was not required to do so. Defendant responded, "I'm just taking this matter to the Appellate Court. No problem. Go ahead." The court informed defendant that if he chose not to be present during the trial, he would have the ability to hear the proceedings and would be able to change his mind and participate at any time. The court then discussed the State's motion *in limine*.

¶ 29    After a recess, the State informed the trial court that it had extended another offer to defendant, which he rejected. The court then proceeded with jury selection. Defendant initially chose to be absent from the courtroom, but returned to the courtroom prior to the questioning of the prospective jurors. However, defendant refused to participate in the selection of jurors, repeating that the trial was not by agreement and that "I don't have to choose nobody because this trial [is] not by agreement." After the jury had been selected, the court admonished defendant that if he was disruptive during the trial, he would be removed from the courtroom. The court then again discussed the procedures of the trial with defendant, and defendant asked several questions about the admissibility of evidence and his ability to cross-examine the police officers the State would be calling as witnesses. The court warned defendant that the questions he asked the witnesses would need to be proper, not disruptive, and defendant responded that "[t]he question[s] will be proper."

¶ 30    Prior to opening statements, defendant indicated that he had filed another motion to dismiss, which was denied by the trial court. During his opening statement, defendant admitted that he was present on the night of December 17, 2017, that he had been driving the vehicle that was parked on the wrong side of the street in front of the police station, and that he had been drinking alcohol. However, he claimed that he had passed the field sobriety tests administered by the police.

¶ 31    The State called as a witness Chicago police officer Joseph Yohanna, who testified that he had been a police officer for approximately eight years. At approximately 2:25 a.m. on December 18, 2017, Yohanna and his partner, Mark Januszewski, were on duty, in uniform and in a marked squad vehicle. They were traveling northbound on Clark Street when they observed a sergeant and police officer outside the 24th District police station speaking with two individuals who were arguing, one of whom Yohanna identified in court as defendant. The sergeant waved the vehicle over, and as they pulled up, Yohanna observed a gray Acura, facing northbound, parked in the southbound lane of traffic, with its headlights on, the driver's side door open, and nobody inside. As Yohanna approached, he could hear the individuals arguing, and the officer already on the scene asked if they had been drinking alcohol but received no response. Yohanna asked defendant if he was the one who was driving the Acura, and defendant responded that he was and handed Yohanna the key to the vehicle.

¶ 32    Yohanna testified that, during his conversation with defendant, Yohanna observed that "[h]e was slurring his words; he was incoherent at times; he had bloodshot, glassy eyes; he spoke to me with slurred speech and he had a strong odor of an alcoholic beverage emitting from his person," specifically, from his breath and his body. Yohanna separated defendant from the individual he was arguing with and again detected a strong odor of an alcoholic beverage emitting from his breath and his body. Yohanna asked defendant if he had a driver's license; defendant initially stated that he had one, but he could not produce it and eventually admitted that he did not have one.

¶ 33    Yohanna testified that he administered several field sobriety tests, beginning with the horizontal gaze nystagmus test. Yohanna testified that there were six "clues of consumption" for the test and an individual needed to display four to be considered impaired; defendant displayed all six and also visibly swayed during the test. Yohanna next administered the "walk and turn" test, which involved eight clues of consumption. Two clues were necessary to show impairment, and defendant displayed five. Finally, Yohanna administered the "one-leg stand" test, which involved four clues of consumption. Two were necessary to show impairment, and

defendant displayed all four. Yohanna also observed that, during the tests, defendant "was very talkative, he had trouble implementing the instructions that I gave to him, [and] he had terrible balance throughout the test." After administering the field sobriety tests, Yohanna placed defendant into custody, and Januszewski, his partner, took defendant into the police station. Yohanna handed the keys to another officer, who placed the keys into the ignition of the Acura and was able to drive it. Yohanna was equipped with a body-worn camera that day, and his camera was activated at the time of his interaction with defendant. The State then sought to admit the video from Yohanna's body-worn camera into evidence, and defendant objected based on authenticity. The court overruled the objection, finding that the State had laid a sufficient foundation as to the authenticity of the video and admitted it into evidence, and the video was published and was played in open court.

¶ 34        Yohanna testified that after Januszewski brought defendant into the station, Januszewski read defendant a "Warning to Motorists," which explained to defendant his rights, and they began a 20-minute observation period. After that observation period, they offered defendant the opportunity to take a Breathalyzer test, but defendant refused. Yohanna then processed defendant, which involved running his name and date of birth through the system.

¶ 35        Yohanna testified that he had conducted approximately 300 investigations of DUI of alcohol throughout his career and that, based on his experience and training, it was his opinion that defendant was under the influence of alcohol while operating a motor vehicle on December 17. Yohanna testified that he based that opinion on defendant's

> "impaired judgment to park the vehicle in the wrong direction with the headlights flashing at people that would be going in the right direction on the street potentially obscuring their vision; his slurred speech; his bloodshot, glassy eyes; the strong odor of an alcoholic beverage that he had emitting from his breath and body throughout my initial contact and throughout processing; the multiple clues of alcohol consumption and impairment that he displayed on the field sobriety tests; [and] his visible sway."

¶ 36        On cross-examination, defendant questioned Yohanna about the video, asking if Yohanna was sure that it was defendant on the video. Yohanna responded that he was sure.

¶ 37        The State also called as a witness Januszewski, Yohanna's partner, who testified that he had been a Chicago police officer for 11 years. Like Yohanna, Januszewski testified that at approximately 2:30 a.m. on December 18, 2017, he and Yohanna were on patrol when they drove past the 24th District police station and observed a sergeant and another officer flagging them down. Januszewski observed two other individuals present, one of whom he identified in court as defendant, as well as a vehicle that was parked facing the wrong side of the street, with its door open and lights on. When he and Yohanna approached the individuals, Januszewski noticed the "[s]trong odor of an alcoholic beverage on [defendant's] breath and body." When Yohanna spoke to defendant, Januszewski observed that defendant's "speech was slurred, [and his] eyes were bloodshot and glassy." Yohanna asked defendant if he was driving the vehicle, and defendant responded that he had been driving the vehicle and handed Yohanna the keys. Yohanna then administered several field sobriety tests. Januszewski observed that defendant had a "very visible sway," and he then left to move the police vehicle. When he returned, he observed defendant attempting the "one-leg stand" test and testified that defendant "was swaying, he had trouble balancing, he kept putting his foot down, he was talkative during the test and at that point my partner terminated the test and the subject was then placed into custody in front of the police station."

- 13 -

¶ 38    Januszewski testified that he walked defendant into the station and read him the "Warning to Motorists," which was a preprinted form that they read any time someone was being detained for a DUI investigation, and which explained the consequences of taking, or not taking, a Breathalyzer test. Defendant refused to sign the form and refused to submit to the test.

¶ 39    Januszewski testified that he was equipped with a body-worn camera that day, and the camera was activated at the time of his interactions with defendant. The State then moved to admit the video from the camera into evidence.[7] Defendant did not object, the court admitted it into evidence, and the video was played in open court before the jury.

¶ 40    Januszewski testified that he had observed hundreds of individuals under the influence of alcohol in the course of his employment and that, in his opinion, defendant was under the influence of alcohol at the time of his interactions with the officers. He based his opinion on "[t]he manner in which [defendant] performed the field sobriety tests; the strong odor of an alcoholic beverage on his breath and body; his extremely slurred speech; bloodshot, glassy eyes; [and] his refusal to take the breath test."

¶ 41    On cross-examination, defendant asked Januszewski why the body camera video had a time stamp of 8:36 when the incident occurred at 2:30 a.m., and Januszewski responded that he did not know. On redirect, Januszewski testified that he did not set the time on the camera and that the incident occurred at approximately 2:30 a.m.

¶ 42    After Januszewski's testimony, the State moved to admit a certified copy of defendant's driving abstract into evidence, and the trial court admitted it into evidence.[8] The State then rested.

¶ 43    The court explained to defendant what a motion for directed verdict was and asked defendant if he wished to file one. During the course of the discussion, defendant stated:

> "DEFENDANT: I didn't understand what you mean by motion, motion for directed verdict, is that what it means?
>
> THE COURT: Yes, sir.
>
> DEFENDANT: I want you to decide?
>
> THE COURT: No. You have asked for a jury trial and the jury will decide.
>
> DEFENDANT: I didn't ask for a jury trial, you asked for a jury trial.
>
> THE COURT: You didn't say anything, [defendant], you said you didn't want a trial, you didn't want a continuance so when you don't say anything this is what happens because this is the default."

After further discussion, defendant stated that he wished to make a motion for a directed verdict, and the trial court denied the motion. Defendant then stated that he did not wish to present any evidence on his own behalf, and the court proceeded to discuss jury instructions.

¶ 44    After the instructions conference, defendant decided that he wished to present evidence on his own behalf and recalled Officer Yohanna to testify. Defendant asked Yohanna about testimony he had given during the preliminary hearing—specifically, defendant asked

---

[7]The record shows that the video was edited to show only the part where Januszewski exited his vehicle and approached Yohanna and defendant.

[8]This exhibit is not contained in the record on appeal, but defendant does not dispute its admission.

Yohanna what he had testified to as to the reason for arresting defendant. Yohanna testified that he had never provided a reason for the arrest during the preliminary hearing.

¶ 45    Defendant then testified on his own behalf, testifying that he was not the person depicted in the body-camera video. Instead, defendant claimed that "it's someone in makeup [to] look like me." Defendant then testified:

> "[T]his video is not me. I was not intoxicated. Yeah, if I want to *** lie on the stand. I was not driving, they cannot prove in the video I was driving but one lie make[s] you [believe] another lie. They cannot prove in this video I was driving. I didn't come out of the car or anything."

However, defendant then continued:

> "[In] [t]he opening statement I [said] about what happened and I was over there and I pull up to the police station and I drove—get out of the car and get the person out and walk him there. The testimony was truth. It was nothing changed. It was nothing changed, exactly what I said, that was it. I get out of the car, I get this guy out [of] the car, push him toward the police station. Sergeant and this guy Mr. Yohanna come out from the police station. Then we [were] talking and then we [were] talking, the sergeant take the guy, he was looking familiar, he quickly take the guy in and Mr. Yohanna go back to the car and I'm still walking to the police station slowly. Then he call me back, I go back to Mr. Yohanna, then he make me—ask[s] me [for the] key, he took the key from me. Then I *** start walking back to the police station, then this is what happened. I start walking back to the police station, he call[s] me back, make me do the walking test, I pass that test. Then I pass the test then he do[es] the eye exam test, I pass that test too. So it's nothing changed and I don't want to say nothing further."

¶ 46    On cross-examination, defendant admitted that he had driven to the police station. When asked whether the Acura belonged to him, defendant testified that "no, [it does] not belong to me because my license [is] suspended and I have to keep driving the last five years without catching tickets so it was in my friend's name." Defendant testified that he parked on the wrong side of the street because his passenger began trying to exit the vehicle, so he pulled up to the police station to escort him out.

¶ 47    After the parties had presented closing arguments, the trial court instructed the jury. With respect to the elements of the offense, the court instructed:

> "A person commits the offense of driving under the influence when he drives or was [in] actual physical control of a vehicle while under the influence of alcohol. To sustain the charge of driving under the influence of alcohol the state must prove the following propositions, first proposition, that the defendant drove or was in actual physical control of a vehicle and, second proposition, that at the time the defendant drove or was in actual physical control of a vehicle the defendant was under the influence of alcohol. If you find from your consideration of all the evidence that each one of these propositions has been proven beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 48    The court also instructed the jury as to the verdict forms:

"The defendant is charged in different ways with the offense of aggravated driving under the influence of alcohol. You will receive two forms of verdict pertaining to each particular way that the offense of aggravated driving under the influence of alcohol is charged. As to each particular way the offense of driving under the influence of alcohol is charged you will be provided both a not guilty and a guilty form of verdict. From these two verdict forms as to each particular way the offense of aggravated driving under the influence of alcohol is charged you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one verdict form as to each particular way that the offense of aggravated driving under the influence is charged.

The verdict forms are as follows, we, the jury, find the defendant, Muhammad Khan, not guilty of aggravated driving under the influence of alcohol. We, the jury, find the defendant, Muhammad Khan, guilty of aggravated driving under the influence of alcohol. We, the jury, find the defendant, Muhammad Khan, not guilty of aggravated driving under the influence of alcohol, no license or permit. We, the jury, find the defendant, Muhammad Khan, guilty of aggravated driving under the influence of alcohol, no license or permit."

¶ 49 After the jury had begun deliberating, it sent out a note to the court, reading: " 'Question, do we have to sign both?' " The court sent a response stating: " 'You have been instructed on the law and your functions as jurors, please continue your deliberations.' " The jury then returned guilty verdicts on both counts of aggravated driving under the influence of alcohol, and the trial court entered judgment on both counts.

¶ 50 On February 13, 2019, defendant filed posttrial motions based on lack of jurisdiction and based on lack of a preliminary hearing, both of which the trial court denied. The court then proceeded to sentence defendant. The court merged count IV (driving with no license) into count II (driving with a revoked license) and sentenced defendant to five years in the IDOC, followed by one year of mandatory supervised release. This appeal follows.

¶ 51                                                    ANALYSIS

¶ 52 On appeal, defendant raises a number of issues, claiming (1) the trial court should have conducted a fitness hearing due to defendant's conduct, (2) defendant did not knowingly and intelligently waive his right to counsel, (3) defendant should have been permitted standby counsel, (4) the trial court erred in instructing the jury, and (5) defendant was entitled to a new trial because he waived his right to a jury trial. We consider each argument in turn.

¶ 53                                              I. Fitness Hearing

¶ 54 Defendant first claims that the trial court erred in not *sua sponte* conducting a fitness hearing because his conduct demonstrated a *bona fide* doubt as to his fitness. We note that defendant raised the same issue in his appeal in *People v. Khan*, 2021 IL App (1st) 190051, so we draw from our analysis in that case where applicable here.

¶ 55 It is well-settled that " '[d]ue process bars the prosecution of an unfit defendant.' " *People v. Washington*, 2016 IL App (1st) 131198, ¶ 70 (quoting *People v. Brown*, 236 Ill. 2d 175, 186 (2010)). Under Illinois law, a defendant is presumed to be fit to stand trial, unless, due to a mental or physical condition, he is unable to understand the nature and purpose of the

- 16 -

proceedings against him or to assist in his defense. *Brown*, 236 Ill. 2d at 186; 725 ILCS 5/104-10 (West 2018). While a defendant's fitness is presumed, "the circuit court has a duty to order a fitness hearing, *sua sponte*, any time a *bona fide* doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense." *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). Whether a *bona fide* doubt as to a defendant's fitness has arisen is generally a matter within the discretion of the trial court. *Sandham*, 174 Ill. 2d at 382. An abuse of discretion is found only "where the [trial] court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Baez*, 241 Ill. 2d 44, 106 (2011).

¶ 56    Defendant acknowledges that he failed to preserve this issue below and asks us to review it for plain error. To preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48. However, the plain-error doctrine permits a reviewing court to consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Since the right to be fit for trial is "fundamental," the question as to a defendant's fitness may be reviewed for plain error under the second prong. *Sandham*, 174 Ill. 2d at 382.

¶ 57    In a plain-error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶ 51. The first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 58    As noted, a trial court has a duty to order a fitness hearing, *sua sponte*, any time a *bona fide* doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense. *Sandham*, 174 Ill. 2d at 382. There is a *bona fide* doubt as to a defendant's fitness if there is a "real, substantial and legitimate doubt" assessed against an objective standard. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). "Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas." *People v. Coleman*, 168 Ill. 2d 509, 524 (1995); *People v. Taylor*, 409 Ill. App. 3d 881, 896 (2011). A person may be fit for trial although his mind is otherwise unsound. *Coleman*, 168 Ill. 2d at 524; *Taylor*, 409 Ill. App. 3d at 896. To determine whether a *bona fide* doubt exists, a court may consider a defendant's irrational behavior, a defendant's demeanor at trial, and any prior medical opinion on the defendant's competence. *People v. Harris*, 206 Ill. 2d 293, 304 (2002). However, there are no fixed or immutable signs that invariably indicate the need for further inquiry. *Harris*, 206 Ill. 2d at 305.

¶ 59    In the case at bar, we cannot say that the trial court abused its discretion by failing to order a fitness hearing. As we found in *Khan*, 2021 IL App (1st) 190051, defendant's conduct leading up to the probation violation hearing did not rise to the level of a *bona fide* doubt as to his fitness. While it was clear that defendant lacked knowledge of legal concepts and refused to accept the trial court's explanations, this lack of knowledge does not render defendant unfit. Moreover, nothing about defendant's conduct during the trial on the DUI charges demonstrated

a *bona fide* doubt as to his fitness. Defendant clearly believed that the trial proceedings were inappropriate and the trial court lacked jurisdiction over the matter, based on his belief that the charges were barred by double jeopardy and had been dismissed at the preliminary hearing. As a result, defendant intentionally chose not to participate in any part of the pretrial proceedings so as not to subject himself to the court's jurisdiction through his conduct. While defendant's belief as to the court's jurisdiction was incorrect, defendant nonetheless developed a strategy that nothing in the case would be done with his agreement and pursued that strategy throughout the trial. Defendant also challenged the video evidence presented at trial. While his claim that the individual depicted in the video was made up to look like him may not have been a persuasive one, defendant also focused on actual discrepancies in the videos, such as pointing out the incorrect timestamp on the videos. Consequently, we cannot find that the trial court abused its discretion in failing to order a fitness hearing when the court possessed two mental health reports by two psychiatrists that defendant was fit to stand trial.

¶ 60      Defendant also points to comments he made about contacting the media and the FBI, arguing that these demonstrated irrational thinking. However, as defendant acknowledges, the trial court twice ordered BCXs after such behavior, which, as noted, came back showing that defendant was fit to stand trial. The mere ordering of a BCX cannot be construed as a showing that the trial court found a *bona fide* doubt as to the defendant's fitness. *People v. Hanson*, 212 Ill. 2d 212, 222 (2004). Here, after receiving the results of each BCX, the trial court was apparently satisfied with defendant's fitness, and we cannot find that this decision was an abuse of discretion.

¶ 61      We similarly find unpersuasive defendant's claim that, even if defendant was fit to stand trial, he was not fit to represent himself, relying on the United States Supreme Court case of *Indiana v. Edwards*, 554 U.S. 164 (2008). In that case, the *Edwards* court noted that mental illness was not a unitary concept and that, in certain circumstances, an individual may be competent to stand trial but, at the same time, may be unable to carry out the basic tasks needed to present his own defense without the help of counsel. *Edwards*, 554 U.S. at 175-76. Thus, the *Edwards* court found that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Edwards*, 554 U.S. at 177-78. Where the defendant is competent to stand trial, but still "suffer[s] from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves," the trial court is permitted to insist upon representation by counsel. *Edwards*, 554 U.S. at 178.

¶ 62      In the case at bar, however, we are not asked to review the trial court's denial of defendant's right to self-representation. Instead, defendant asks us to read *Edwards* to require the trial court to deny defendant the right to represent himself, even where the trial court is satisfied as to defendant's fitness to stand trial. Nothing in *Edwards* imposes such a requirement. See *People v. Allen*, 401 Ill. App. 3d 840, 852 (2010) ("Nothing in *Edwards* requires a trial court to do what defendant now argues should have been done, *i.e.*, the forced denial by the trial court of defendant's right to proceed *pro se* although he was found mentally competent to stand trial."); *People v. Tatum*, 389 Ill. App. 3d 656, 670 (2009) ("*Edwards* did not hold that there was a higher standard of competence requiring an additional inquiry before a trial court permits a defendant to proceed *pro se*. Rather, *Edwards* simply held that a defendant's right to self-representation was not absolute and could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation."). Indeed, the

*Edwards* court recognized that the trial court "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177.

¶ 63    Here, the record on appeal shows that defendant was competent to represent himself at trial. Given the numerous motions he filed, defendant was clearly able to use the legal system to place his arguments before the court. He was present and attentive at all of the proceedings, asking questions when he did not understand something, and any comments he made were relevant to the case before him. He presented an opening statement and closing argument, objected to the admission of evidence, cross-examined the State's witnesses, and presented witnesses in his defense by recalling Officer Yohanna and testifying on his own behalf. Defendant also filed a motion for directed verdict at the close of the State's case and posttrial motions at the conclusion of the trial. During sentencing, the trial court commented that it found defendant to be "intelligent enough to make certain arguments," even though those arguments were not successful. The court further found that defendant had "use[d] the process that's available to him" but that he had done so to frustrate the proceedings. Defendant's trial strategy was that he did not believe that the charges against him were valid and refused to accept the court's explanations as to their validity. We cannot find that the trial court abused its discretion in failing to hold a fitness hearing as to defendant's ability to represent himself where there is no indication that defendant's trial strategy was the result of his mental competence. As we noted in *Tatum*, "[p]erhaps defendant's self-representation was foolish and unwise, yet, the record does not show that it was the result of mental incompetence." *Tatum*, 389 Ill. App. 3d at 671. Since we find that the trial court did not abuse its discretion in failing to order a fitness hearing, there was no error, and consequently, there can be no plain error. See *Sebby*, 2017 IL 119445, ¶ 49 (the first step in a plain-error analysis is determining "whether there was a clear or obvious error at trial").

¶ 64                                II. Waiver of Counsel

¶ 65    Next, defendant claims that he did not knowingly and intelligently waive his right to counsel because he did not understand the nature of the charges against him. The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees an accused in a criminal proceeding the right to the assistance of counsel. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). Any waiver of that right must be voluntary, knowing, and intelligent. *Jiles*, 364 Ill. App. 3d at 328 (citing *People v. Haynes*, 174 Ill. 2d 204, 235 (1996)). A defendant's waiver of the right to counsel must be clear and unequivocal. *People v. Mayo*, 198 Ill. 2d 530, 538 (2002); *People v. Burton*, 184 Ill. 2d 1, 21 (1998). The purpose of requiring a clear and unequivocal waiver is to "(1) prevent the defendant from appealing [either] the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *Mayo*, 198 Ill. 2d at 538. To determine whether a defendant's waiver was clear and unequivocal, a court will look to the overall context of the proceedings, including the defendant's conduct following the defendant's request to represent himself. *Mayo*, 198 Ill. 2d at 538-39.

¶ 66    As with the issue of his fitness, defendant acknowledges that he has not preserved this issue and asks us to review it for plain error. See *Sebby*, 2017 IL 119445, ¶ 48 (to preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the

error at trial and (2) raise the error in a posttrial motion). As noted, under the plain-error doctrine, we may consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565. Since the right to counsel is fundamental, the claim that there was no effective waiver of counsel may be reviewed under the second prong of the plain-error doctrine. *People v. Herring*, 327 Ill. App. 3d 259, 261 (2002); *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 12. However, as noted, the first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 67    In the case at bar, defendant claims that his waiver of counsel was ineffective because he did not understand the nature of the charges against him. A trial court's decision on a defendant's election to proceed *pro se* will be reversed only if the trial court abused its discretion. *People v. Hunt*, 2016 IL App (1st) 132979, ¶ 16. As noted, an abuse of discretion is found only "where the [trial] court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 106.

¶ 68    If a defendant's decision to represent himself is freely, knowingly, and intelligently made, it must be accepted, even if the court may consider such a decision unwise. *Baez*, 241 Ill. 2d at 116. "However, although a defendant need not possess the skill and experience of a lawyer in order to choose self-representation competently and intelligently, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 117. "The requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 117. The determination of whether there has been an intelligent waiver of the right to counsel "must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *People v. Lego*, 168 Ill. 2d 561, 565 (1995) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

¶ 69    In the case at bar, we cannot find that the trial court abused its discretion in permitting defendant to represent himself at trial. Defendant was admonished many times as to his right to counsel, the nature of the charges against him, and the sentencing range he faced and does not argue otherwise on appeal. See Ill. S. Ct. R. 401(a) (eff. July 1, 1984) (a trial court must make certain admonishments before a defendant may waive counsel). There is no indication that defendant failed to understand that he was being charged with DUI of alcohol based on his conduct during the early morning hours of December 18, 2017. Defendant's argument on appeal is based on the fact that defendant believed that the charges against him were not valid, pointing to his numerous motions to dismiss and his conduct during trial. However, the fact that defendant had a poor defense to the charges does not mean that defendant failed to understand the nature of the charges against him.

¶ 70        The case at bar bears no resemblance to *People v. Perkins*, 2018 IL App (1st) 133981, a case relied on by defendant. There, we found that the trial court did not abuse its discretion in denying the defendant's request to represent himself, where the defendant was schizophrenic, requested a trial even though discovery was not yet completed, and responded that he was " 'not interested in that right now' " when the court asked if he understood what was involved in a death penalty case. *Perkins*, 2018 IL App (1st) 133981, ¶ 48. In that case, however, we were reviewing whether the court abused its discretion in *denying* the defendant's request to proceed *pro se*, while here, we are reviewing whether the court abused its discretion in *permitting* defendant to proceed *pro se*. Given the deferential standard of review, this difference is significant. More importantly, however, this case bears no factual similarity to *Perkins*. Defendant in the case at bar understood the charges he was facing—he simply believed, or used as a trial strategy, that those charges had previously been dismissed at the preliminary hearing and would not accept any explanation otherwise. Accordingly, we cannot find that the trial court abused its discretion in permitting defendant to proceed *pro se*. Therefore, where there was no error, there can be no plain error. See *Sebby*, 2017 IL 119445, ¶ 49 (the first step in a plain-error analysis is determining "whether there was a clear or obvious error at trial").

¶ 71                                  III. Standby Counsel

¶ 72        Defendant next claims that the trial court erred in denying him standby counsel. A *pro se* defendant does not have a right to standby counsel, but since there is no state statute or court rule to the contrary, such appointment is permissible. *People v. Gibson*, 136 Ill. 2d 362, 383 (1990); *McKaskle v. Wiggins*, 465 U.S. 168, 170 (1984). If the trial court appoints standby counsel, it retains broad discretion to determine the scope of standby counsel's involvement. *People v. Redd*, 173 Ill. 2d 1, 38 (1996); *People v. Smith*, 249 Ill. App. 3d 460, 470-71 (1993). However, a *pro se* defendant maintains the right to control the case presented, and standby counsel's participation should not be allowed to destroy the perception that defendant is representing himself. *Gibson*, 136 Ill. 2d at 377-78; *McKaskle*, 465 U.S. at 178.

> "Thus, standby counsel may assist a *pro se* defendant 'in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete,' and may also help 'ensure the defendant's compliance with basic rules of courtroom protocol and procedure.' " *Gibson*, 136 Ill. 2d at 378 (quoting *McKaskle*, 465 U.S. at 183).

Whether the trial court erred in refusing to appoint standby counsel is reviewed under an abuse of discretion standard. *Gibson*, 136 Ill. 2d at 379. As noted, an abuse of discretion is found only "where the [trial] court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 106.

¶ 73        As with his previous claims, defendant acknowledges that he has not preserved this issue and asks us to review it for plain error. See *Sebby*, 2017 IL 119445, ¶ 48 (to preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion). As noted, under the plain-error doctrine, we may consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice

against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565. However, as noted, the first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 74 In the case at bar, defendant claims that his lack of abilities and experience warranted the appointment of standby counsel. Our supreme court has instructed that "[r]elevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 Ill. 2d at 380. We note that the trial court in the case at bar had the ability to observe defendant's demeanor and conduct throughout the proceedings, including his ability to understand the proceedings, and discussed defendant's education and legal knowledge several times prior to permitting him to represent himself. Additionally, when considering defendant's request for standby counsel, the court expressly asked the State about the complexity of the charges and whether there would be any scientific evidence, such as blood testing or Breathalyzer results, that would be involved. Having been informed that no such evidence would be presented, the court found that, while the possibility of incarceration was "serious," the complexity of the case did not require the appointment of standby counsel. We cannot find that the court's decision was an abuse of discretion.

¶ 75 Defendant contends that he lacked any legal knowledge, which resulted in him filing repeated meritless motions and making ineffective arguments. However, as noted, defendant believed, or used as a trial strategy, that the charges against him were invalid, even after the trial court and the State had explained the process by which the charges had been filed multiple times. Even if standby counsel had been appointed, defendant remained in control of the case he wished to present, and defendant here repeatedly made clear that the case he wished to present was based on the validity of the charges. See *Gibson*, 136 Ill. 2d at 377-78; *McKaskle*, 465 U.S. at 178. There is nothing to suggest that standby counsel would have been any more effective in changing defendant's mind as to that issue than the court or the State had been. Moreover, where defendant did not understand the legal process, the trial court explained it to him. Thus, for instance, while defendant did not understand what a motion for a directed verdict was, the court explained it to him and interpreted his comments as wishing to file one, which it then considered.

¶ 76 Defendant also claims that standby counsel would have assisted with jury selection, where several jurors expressed doubt as to their ability to be fair and impartial. However, neither juror defendant identifies as problematic indicated that they were unable to be fair and impartial. One juror, who was a bartender, answered "yes" to the question of whether anything about the nature of the allegations would affect his ability to be fair and impartial, explaining that, as a bartender, he "take[s] it very seriously to make sure that people are safe when they leave my establishment. But then sometimes you are not able to guarantee as soon as somebody exits those doors, I have fulfilled that responsibility so just something that is on my mind." However, he also promised to be fair and impartial and that he would be able to sign either a guilty or not guilty verdict, depending on the evidence presented at trial. The other juror, whose brother

was shot 40 years previously, answered "I don't know. Maybe," to the question of whether anything about the experience that would affect her ability to be fair and impartial. The court asked what she meant, and she responded "[t]hat I might be partial about, you know, if somebody got killed or murdered or something like that." We cannot find that the acceptance of these jurors demonstrated the necessity of standby counsel.

¶ 77 Finally, defendant contends that he failed to meaningfully test the State's case, claiming that "[t]he critical issue in this case was whether [defendant] drove or was in actual physical control of the car." However, defendant was able to examine the State's witnesses and attempted to cast doubt on the body camera videos by, in part, pointing out the incorrect time stamps. Defendant also attempted to impeach Officer Yohanna through the use of his testimony at the preliminary hearing, which was ultimately unsuccessful.

¶ 78 The case at bar represented a relatively straightforward case, with no scientific evidence and few witnesses. The issues were clearly defined: (1) whether defendant was driving or in actual physical control of the vehicle, (2) whether he was under the influence of alcohol, and (3) whether he had a driver's license at the time. There was body-camera video, which showed defendant's interactions with the police, and defendant admitted to the police officers at the scene to drinking alcohol, to driving, and to driving without a license. While the possibility of incarceration is a serious matter, we cannot find that the court abused its discretion in determining that standby counsel was not needed. Indeed, we note that it appears that no Illinois trial court has *ever* been reversed for exercising its discretion not to appoint standby counsel. See, *e.g.*, *People v. Williams*, 277 Ill. App. 3d 1053, 1060 (1996) ("*[N]o* trial court in Illinois has been reversed for exercising its discretion to *not* appoint standby counsel, and this absence of reversals appears consistent with nationwide experience." (Emphases in original.)); *People v. Pratt*, 391 Ill. App. 3d 45, 57 (2009) (reiterating same proposition); *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 42 (same). In addition, during the course of the trial, defendant never renewed his request for standby counsel. Consequently, because there was no error, there can be no plain error. See *Sebby*, 2017 IL 119445, ¶ 49 (the first step in a plain-error analysis is determining "whether there was a clear or obvious error at trial").

¶ 79 IV. Jury Instructions

¶ 80 Defendant also contends that the trial court erred in instructing the jury as to the elements of the aggravated DUI of alcohol charges against him. Specifically, defendant claims that the trial court erred by not, *sua sponte*, issuing an instruction defining "actual physical control" or instructing the jury as to the elements of aggravated DUI of alcohol with a revoked or suspended driver's license. "[T]he purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thus enabling the jury to reach a proper conclusion based on the applicable law and the evidence presented." *People v. Parker*, 223 Ill. 2d 494, 500 (2006). A reviewing court will reverse a trial court's determination as to what instructions to give only if it finds that the trial court abused its discretion. *People v. Gilliam*, 2013 IL App (1st) 113104, ¶ 41. "In making this determination, we are to examine whether the instructions given, when taken as a whole, fairly, fully and comprehensively apprised the jury of the relevant law." *Gilliam*, 2013 IL App (1st) 113104, ¶ 41 (citing *Parker*, 223 Ill. 2d at 501). However, the question of whether jury instructions accurately conveyed the applicable law is reviewed *de novo*. *Parker*, 223 Ill. 2d at 501. *De novo* consideration means we perform

the same analysis that a trial judge would perform. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68.

¶ 81    As noted, both an objection and a written posttrial motion raising an issue are necessary to preserve an error for appellate review. See *Sebby*, 2017 IL 119445, ¶ 48. This principle applies to errors in jury instructions as well as to other trial errors. See *People v. Herron*, 215 Ill. 2d 167, 175 (2005) ("Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion."); *Parker*, 223 Ill. 2d at 507. However, Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) provides that "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Our supreme court has found that Rule 451(c) is coextensive with the plain-error rule and is construed identically. *Herron*, 215 Ill. 2d at 175. In the case at bar, defendant acknowledges that he did not properly preserve this issue and asks us to review it for plain error.

¶ 82    As explained above, under the plain-error doctrine, we may consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565. "[A] jury instruction error rises to the level of plain error only when it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.'" *Herron*, 215 Ill. 2d at 193 (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004)). However, as noted, the first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 83                    A. "Actual Physical Control" Instruction

¶ 84    Defendant first claims that the trial court erred in failing to define "actual physical control" when setting forth the elements of the DUI of alcohol charges. The trial court in the case at bar instructed the jury based on Illinois Pattern Jury Instructions, Criminal, Nos. 23.13, 23.14, 23.67E, 23.68E (approved Dec. 8. 2011) (hereinafter IPI Criminal Nos. 23.13, 23.14, 23.67E, 23.68E). The court first instructed the jury based on IPI Criminal No. 23.13, instructing:

    "A person commits the offense of driving under the influence of alcohol when he drives or is in actual physical control of a vehicle while under the influence of alcohol."

¶ 85    The court then instructed the jury based on IPI Criminal No. 23.14, instructing:

    "To sustain the charge of driving under the influence of alcohol, the State must prove the following propositions:

    *First Proposition:* That the defendant drove or is in actual physical control of a vehicle; and

    *Second Proposition:* That at the time the defendant drove or is in actual physical control of a vehicle, the defendant was under the influence of alcohol.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 86　　　　The court then gave two instructions concerning aggravated DUI of alcohol. First, the court instructed the jury based on IPI Criminal No. 23.67E:

"A person commits the offense of aggravated driving under the influence of alcohol when he drives a vehicle while under the influence of alcohol, and in so driving a vehicle, he does not possess a driver's license or permit or a restricted driving permit or a judicial driving permit or a monitoring device driving permit."

¶ 87　　　　Finally, the court instructed the jury based on IPI Criminal No. 23.68E:

"To sustain the charge of aggravated driving under the influence of alcohol, the State must prove the following propositions:

*First Proposition:* That the defendant drove or was in actual physical control of a vehicle; and

*Second Proposition:* That at the time the defendant drove or was in actual physical control of a vehicle, the defendant was under the influence or alcohol; and

*Third Proposition:* That at the time the defendant drove or was in actual physical control of a vehicle, the defendant did not possess a driver's license or permit or a restricted driving permit or a judicial driving permit or a monitoring device driving permit.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 88　　　　IPI Criminal Nos. 23.13, 23.67E, and 23.68E provide in the committee notes that, "[w]hen actual physical control is an issue, give Instruction 23.43." IPI Criminal No. 23.13, Committee Note; IPI Criminal No. 23.67E, Committee Note; IPI Criminal No. 23.68E, Committee Note. However, the trial court did not give an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 23.43 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 23.43), which provides:

"The phrase 'actual physical control' means that the defendant was in the vehicle and in a position to exercise control over the vehicle by starting the engine and causing the vehicle to move."

Defendant claims that the lack of this instruction constitutes error that entitles him to a new trial.

¶ 89　　　　Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) requires that, in a criminal case, if the court determines the jury should be instructed on a subject and the IPI Criminal contains an applicable instruction, "the IPI Criminal instruction shall be used, unless the court determines that it does not accurately state the law." See also *Hopp*, 209 Ill. 2d at 7. Our

supreme court in *Hopp* additionally found that, where a committee note to an IPI Criminal instruction indicates to give another instruction, the failure to give the additional instruction is error. *Hopp*, 209 Ill. 2d at 7. In the case at bar, as noted, IPI Criminal Nos. 23.13, 23.67E, and 23.68E all provide in the committee notes that, "[w]hen actual physical control is an issue, give Instruction 23.43." Thus, the trial court should have given an instruction based on IPI Criminal No. 23.43 unless (1) actual physical control was not an issue or (2) IPI Criminal No. 23.43 did not accurately state the law.

¶ 90     Reviewing the record on appeal, we cannot find that actual physical control was an issue in the case such that IPI Criminal 23.43 was required. While defendant contends that "the State's main theory was that [defendant] had actual physical control of the car," that is not entirely accurate. As noted, the charged offenses required the State to prove that defendant "drove or was in actual physical control of a vehicle." See IPI Criminal Nos. 23.14, 23.68E. Thus, the State could prove its case by proving either that defendant drove or that defendant was in actual physical control of the vehicle. In the case at bar, the State primarily focused on the first—that defendant drove the vehicle. We first note that defendant admitted to driving the vehicle during his opening statement, essentially conceding the issue before any evidence had been presented. Additionally, during its closing argument, the State emphasized that defendant admitted numerous times to driving the vehicle, both to the officers on the scene and at trial, and even explained why he parked the vehicle on the wrong side of the street. The State acknowledged that the officers did not observe defendant physically exiting from the vehicle but argued that circumstantial evidence established that defendant was the driver, pointing to the fact that he claimed the vehicle as his,[9] that he had the keys, and that he was standing where it was parked.

¶ 91     The State did also make an argument based on actual physical control, but this was a secondary argument. The State argued:

> "But if you are not convinced that he drove the vehicle that's fine because the statute says he drove it or is in actual physical control of the vehicle. So even if you don't believe that he drove the vehicle, he was the one that was in physical control of the vehicle, he had the keys, right, he left the door open because it's right there, he is not going to go anywhere and he is the only one that could have left that scene in that vehicle until he handed the keys off to the officer, his friend couldn't have left the scene, he doesn't have the keys, the keys were in the defendant's hand, he had control of that vehicle."

However, while the State did present "actual physical control" as an alternative argument, we cannot find that it was "an issue" in the case such that IPI Criminal No. 23.43 was required, given the focus on defendant as the driver, and especially where defendant admitted to being the driver at the scene in his opening statement and in his testimony. Accordingly, we cannot find that the trial court erred in failing to *sua sponte* give IPI Criminal No. 23.43 when it was instructing the jury. Consequently, because there was no error, there can be no plain error. See *Sebby*, 2017 IL 119445, ¶ 49 (the first step in a plain-error analysis is determining "whether

[9]As noted, defendant's testimony at trial was that the vehicle was titled in a friend's name because defendant's license was suspended "and I have to keep driving the last five years without catching tickets so it was in my friend's name."

there was a clear or obvious error at trial").

¶ 92                              B. Revoked License Instruction

¶ 93     Defendant also claims that the trial court erred in failing to instruct the jury as to the elements of aggravated DUI of alcohol with a suspended or revoked license. We note that, while the parties discuss "suspended or revoked license" collectively, defendant was charged under separate counts for each, and the State indicated that it was proceeding on "Counts 2 and 4," which were the counts alleging that defendant had a revoked license (count II) and did not possess a driver's license (count IV); these two counts were also the counts for which defendant was convicted. Accordingly, we focus on whether the jury was properly instructed as to aggravated DUI of alcohol while defendant had a revoked license.

¶ 94     In the case at bar, there is no dispute that the trial court did not instruct the jury on the elements of aggravated DUI of alcohol with a revoked license.[10] Thus, there is no dispute that there has been a clear and obvious error. The question, then, is whether this error rises to the level of plain error. Our supreme court has instructed that "a jury instruction error rises to the level of plain error only when it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *Herron*, 215 Ill. 2d at 193 (quoting *Hopp*, 209 Ill. 2d at 8).

¶ 95     In the case at bar, the State contends that "this Court has repeatedly held that failure to provide an instruction on an essential element of an offense is harmless error when that element is established by overwhelming evidence." See, *e.g.*, *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003) ("An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed."). Here, because defendant's driving abstract was admitted into evidence, the State claims that defendant's license revocation was established by overwhelming evidence. We do not find this argument persuasive.

¶ 96     This is not a case where the trial court failed to provide an instruction on an element of the offense. Instead, this is a case where the trial court failed to provide an instruction on the offense itself—the jury received no instruction whatsoever concerning aggravated DUI of alcohol while having a revoked license. The only instructions the jurors received defined (1) DUI of alcohol and (2) aggravated DUI of alcohol while not possessing a valid driver's license. Moreover, the verdict forms received by the jury likewise contained no reference to aggravated DUI of alcohol while having a revoked license—the verdict forms given to the jury were for (1) aggravated DUI of alcohol while not possessing a driver's license and (2) aggravated DUI of alcohol, which did not specify any particular aggravating factor. Thus, the jury was never instructed as to any of the elements of aggravated DUI of alcohol while having a revoked license—the charge was simply never presented to the jury at all. The failure to correctly inform the jury of the elements of the crime charged has been held to be error "so grave and fundamental" so as to rise to the level of plain error under the second prong of the plain-error rule. *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981); *People v. Hari*, 218 Ill. 2d

---

[10]We note that the IPI Criminal does not contain such an instruction. While there are instructions for driving with a revoked or suspended driver's license (see Illinois Pattern Jury Instructions, Criminal, Nos. 23.39, 23.40 (approved Dec. 8, 2011)), there is no instruction for aggravated DUI of alcohol with a revoked or suspended driver's license.

275, 296 (2006). Accordingly, because the jury was never instructed as to the elements of aggravated DUI of alcohol while having a revoked license, defendant's conviction on that count must be vacated.

¶ 97 However, despite defendant's contention to the contrary, this does not require a new trial. The trial court merged defendant's convictions on counts II and IV, so defendant received a single conviction and sentence, as was appropriate. See *People v. Hamerlinck*, 2018 IL App (1st) 152759, ¶ 55. Both counts were Class 4 felonies (625 ILCS 5/11-501(d)(2)(A) (West 2018)), and defendant was sentenced to five years in the IDOC, followed by one year of mandatory supervised release. As we have discussed above, there was no error in defendant's conviction on count IV, as the jury was properly instructed on aggravated DUI of alcohol while not possessing a driver's license. Accordingly, defendant's conviction on that count remains valid. The trial court chose to merge count IV into count II, so we order the mittimus to be corrected to reflect count IV as the count on which defendant was convicted pursuant to our authority under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967). See *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007) (ordering mittimus corrected on aggravated DUI of alcohol charges to reflect a single conviction and merging the remaining counts).

¶ 98                                    V. Waiver of Jury Trial

¶ 99 Finally, defendant claims that he is entitled to a new trial because he waived his right to a jury trial. "The right to a trial by jury is a fundamental right guaranteed by our federal and state constitutions." *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). A defendant may waive the right to a jury trial, but such a waiver must be knowingly and understandingly made. 725 ILCS 5/103-6 (West 2018); *Bracey*, 213 Ill. 2d at 269. A trial court need not give any specific admonition or advice for a defendant to make an effective jury waiver but must ensure that the defendant's waiver is made expressly and understandingly. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). "The determination of whether a jury waiver is valid cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case." *Bannister*, 232 Ill. 2d at 66. Where the facts are not in dispute, the question of whether a defendant knowingly and understandingly waived his right to a jury trial is a legal one that we review *de novo*. *Bracey*, 213 Ill. 2d at 270. As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Carlisle*, 2019 IL App (1st) 162259, ¶ 68.

¶ 100 Defendant acknowledges that he failed to properly preserve this issue by failing to object at trial and raise the issue in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48. As discussed above, under the plain-error doctrine, we may consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565. Whether a defendant's fundamental right to a jury trial has been violated is a matter that our supreme court has found may be considered under the second prong of the plain-error doctrine. See *Bracey*, 213 Ill. 2d at 270. However, as noted, the first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 101    In the case at bar, defendant contends that he waived his right to a jury trial when he sent the trial court a letter in early 2018, which provided:

> "First and foremost I would like to apologize for my misbehaving in your court room on 01-16-18. This was my first time in a court room without [a] private attorney. I felt that the [state's attorneys] were being very hard on me and it made me very stressful. For a false matter being discussed about me. That on 12-18-17 [the] officer created a case against me and on 12-22-17 [the preceding] judge on my case dropped all charges.

> I am very wrong for my words I used on that day in your court room, the words I said were out of stress and anger, *the words I said were that I wanted a jury trial and I would like to take my words back. I promise that in the future I will always think about my words before I speak them. I would like to ask the Honorable Judge to be my jury in this matter. I pray and hope my request is granted.*" (Emphasis added.)

Defendant claims that this letter represented an express waiver of his right to a jury trial, and the trial court's proceeding with a jury trial in the face of that waiver was error. We do not find this argument persuasive.

¶ 102    Defendant's letter was sent to the court in February 2018, early in the proceedings; for context, the violation of probation hearing occurred on August 15, 2018, and the trial on the DUI charges occurred in January 2019. While the letter could arguably be construed as a jury waiver, defendant's subsequent conduct showed that the trial court properly chose not to interpret it as such. After defendant was sentenced on the probation matter, the focus turned to the DUI charges. The trial court informed defendant that "it will be a jury trial unless [defendant] waives."

¶ 103    When the matter came before the court on November 13, 2018, the court had a discussion with defendant specifically about the fact that the trial was set to be a jury trial. When the State informed the court that the matter was set for a jury trial, defendant responded, "Nothing by-agreement, your Honor." The State informed the court that it was not ready for trial, and defendant interjected, stating: "Who is demanding jury trial? I'm not agreeing for anything." The court responded:

> "THE COURT: All right. [Defendant], the only person who picks a jury trial is you. If you don't want a jury trial then you don't have a jury trial.
>
> DEFENDANT: Your Honor, I [do] not agree for any trial."

¶ 104    The trial court explained to defendant that cases were resolved either by agreement or by going to trial, but defendant repeatedly stated, "Nothing by-agreement" while also stating that was not agreeing to trial. The court then discussed with defendant:

> "THE COURT: *** I take it then if you are not agreeing to any dates, that it you're asking to go Motion State—
>
> DEFENDANT: Continue, not by-agreement, trial not by-agreement, prosecution not by-agreement. And I already filed (inaudible). I'm doing my rights. I love [the] United States Constitution.
>
> So as much as I—
>
> THE COURT: I understand that. If it's not by-agreement, it is motion state, defendant demands trial.
>
> Bench or jury, [defendant]?

DEFENDANT: Nothing. Nothing by-agreement.

THE COURT: All right. [Defendant]—

DEFENDANT: *** I am not giving you [any] chance for personal jurisdiction.

THE COURT: That's fine, [defendant].

Then since [defendant] has not indicated—

DEFENDANT: Nothing by-agreement.

THE COURT: It will be a jury, since that is—

DEFENDANT: Nothing by-agreement.

THE COURT: All right.

Motion State—

DEFENDANT: I'm not going to pass no jury.

THE COURT: [Defendant], *** I want you to listen carefully. I have already admonished you for—

DEFENDANT: You [are] just running this court with your own jurisdiction.

THE COURT: —trial in absentia.

DEFENDANT: No.

THE COURT: [Defendant]—

DEFENDANT: Nothing by-agreement.

THE COURT: [Defendant], if you willfully fail to appear for trial, your absence could be taken as a waiver of your right to be here for trial.

DEFENDANT: Nothing by-agreement. You can do what you do your Honor. I have no problem. There is nothing by-agreement."

¶ 105     Thus, the record shows that the trial court asked defendant several times whether he wished to proceed with a bench trial or a jury trial, and defendant refused to give an answer, apparently under the impression that if he failed to cooperate in any way, the trial could not move forward. Our supreme court has instructed that "[its] decisions have imposed on a trial court the duty of ensuring that a defendant waived the right to a jury trial expressly and understandingly." *Bannister*, 232 Ill. 2d at 66. In the case at bar, the trial court attempted to fulfill that duty by attempting to clarify whether defendant wished to proceed with a bench trial or a jury trial. Where defendant refused to give a clear answer, the trial court properly proceeded by finding no waiver and provided defendant with his constitutionally guaranteed jury trial. We find no error in the trial court's conduct. Accordingly, where there is no error, there can be no plain error. See *Bannister*, 232 Ill. 2d at 71 ("Having found no error, there can be no plain error.").

¶ 106                                        CONCLUSION

¶ 107     For the reasons set forth above, we affirm the judgment of the trial court in part. First, the trial court did not err in failing to conduct a fitness hearing. Second, the trial court did not err in permitting defendant to represent himself. Third, the trial court did not err in denying defendant the use of standby counsel. Fourth, the trial court did not err in failing to issue a jury instruction defining "actual physical control." However, the trial court did err in failing to instruct the jury as to the elements of aggravated DUI while having a revoked license, and defendant's conviction on that count is vacated and the mittimus must be corrected to reflect a conviction on count IV instead of count II. Fifth, the trial court did not err in proceeding with

a jury trial.

¶ 108          Judgment affirmed in part and vacated in part; mittimus corrected.